# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAMANTHA RICHARDSON, the natural mother of decedent K.M.; A.M., sibling of decedent K.M.; S.M., sibling of decedent K.M.; and KARIN ROGERS, the maternal grandmother of K.M.; and the estate of K.M., | Case No. 2:10-cv-00648-BLW<br><br>MEMORANDUM DECISION AND ORDER |
|       Plaintiffs, | |
|       v. | |
| The IDAHO DEPARTMENT OF HEALTH AND WELFARE, a political subdivision of the state of Idaho; STACEY WHITE, personally and in her official capacity; JENNIFER DUNCAN, personally and in her official capacity; JEREMY M. CLARK and AMBER M. CLARK and the marital community; John Doe 1 and John Doe 2 and others to be named hereafter; and the real property located at: 1605 E. 2nd Avenue, Post Falls, Idaho, legally described as: | |
| Lot 3 Block 6, RIVERVIEW PARK ADDITION AT POST FALLS, Kootenai County, State of Idaho, according to the plat recorded in Book "D" of Plats, Page 161, records of Kootenai County, Idaho., | |
|       Defendants. | |

**INTRODUCTION**

K.M., a two-year old child, died while in the care of her foster parents, Jeremy M. Clark and Amber M. Clark. The medical examiner who investigated K.M.'s death concluded that her death was "un-natural" and classified her death "as homicide." Before K.M. died, K.M.'s mother, Plaintiff Samantha Moore,[1] pleaded with K.M.'s case workers, Defendants Stacy White and Jennifer Duncan, to remove K.M. from the Clarks' care because Moore believed the Clarks were abusing K.M. Tragically, K.M. was not removed from the Clarks' care. Now, K.M.'s family, the plaintiffs in this action, claim that White and Duncan are responsible for K.M.'s death.

Before the Court is Defendants' Motion for Summary Judgment (Dkt. 96). The Court heard oral argument on September 1, 2015, and took the matter under advisement. For the reasons set forth below, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.

**BACKGROUND**

Plaintiff Samantha Moore is the biological mother of three children, A.M., S.M., and the deceased child, K.M., who were removed from Moore's care in November 2008 and placed in the custody of foster parents, Amber and Jeremy Clark. *Def's SOF* ¶ 1. K.M.'s maternal grandmother, Karin Rogers, the Estate of K.M., and K.M.'s siblings,

---

[1] Plaintiff Samantha Moore changed her name from Samantha Richardson in 2014, after this case was filed.

A.M. and S.M. are also plaintiffs in this matter. *Id.* ¶ 2.

K.M. was two years old when she was placed in foster care. Shortly before her placement in foster care, on October 22, 2008, Moore completed a 24-month and 27-month assessment for K.M. *Watson Aff.*, "Ages & Stages Questionnaires, Ex. C, Dkt. 106-3. According to those assessments, K.M. was doing well in all assessed areas. *Watson Aff.*, "Ages & Stages Questionnaires, Ex. C, Dkt. 106-3. Moore believes that, at the time of removal, K.M. was perfectly healthy. *Defs' SOF* ¶ 7.

Defendant Stacy White was the primary case worker for the Idaho Department of Health & Welfare ("IDHW") in making decisions regarding the sheltering of A.M., S.M., and K.M. Defendant White held that position until January 5, 2009. *Defs' SOF* ¶ 4. 5. On January 5, 2009, primary responsibility for the matter was transferred to Defendant Jennifer Duncan. *Id.* ¶ 5.  Moore visited her children three times, at an IDHW facility, between the date of removal, on November 19, 2008, and the date of K.M.'s injury seven weeks later, on January 7, 2009. *Id.* ¶ 4.

1. **Three Visits**

The first visit occurred on December 11, 2008. *White Aff.* ¶ 19. White and Kimberly Hushman, who was serving as the guardian ad litem for the Moore children through the CASA (Court Appointed Special Advocate) program, were present at the visit. *Defs' SOF* ¶ 16. Moore noticed a knot on K.M.'s head and was told K.M. slipped on icy steps, which resulted in the knot. *Defs' SOF* ¶ 18.  No one else present at the visit noticed the knot on K.M.'s head. *Def's SOF* ¶ 22.

**MEMORANDUM DECISION AND ORDER - 3**

Also during the visit, K.M.'s brother, S.M., reported that he witnessed Jeremy

Clark spank K.M. White told Moore that she doubted that happened because the IDHW

has a clear policy against corporal discipline by foster parents. White also told Moore she

would look into the situation, which she apparently did and apparently found no evidence

that K.M. had been spanked by the Clarks. *White Aff.* ¶ 19. Moore did not think White

conducted an adequate investigation. *Pls' Obj. to Defs.' SOF*, p. 4, Dkt. 107

The second visit occurred a week later, on December 17, 2008. At this visit,

Moore noticed what she described as a "goose egg" on K.M's forehead. *Def's SOF* ¶ 33.

White described the bruise as about the size of a quarter, not raised, and with no broken

skin around the bruise. *Id.* According to Moore, she told White that "something's not

right, and she doesn't ever get bumps or bruises on her face, and I want[] my kids out of

[the Clark house]," and White responded that she would look into it. *Id.* ¶ 34.  Rogers

recalls observing a bruise on K.M.'s arm, as well as observing that K.M. appeared

dehydrated and to have lost weight. *Id.* ¶ 35.

White agrees that Moore expressed concerns about K.M.'s bruise on her forehead,

as well as K.M.'s behavior during the visit. White explained to Moore that K.M. had

apparently been sick, and was awake during the previous night with a runny nose and

cough. *Id.* ¶ 36. White also spoke with Amber Clark about the bruise, and Clark

apparently explained that K.M. had collided with one of Clark's children. White

maintains that she verified the story by locating a similar bruise on the head of the Clark

child. *Id.* ¶ 37. Moore, however, maintains that none of the contemporaneous records or

notes supports White's assertion that she "verified the story." *Richardson (aka Moore) Aff.* ¶ 12. Moore did not think the story made sense. *Id.*

The third visit occurred another week later on December 24. Moore reports that K.M. had black eyes, scratches on her neck, and was lethargic and sleepy. Moore also maintains that K.M.'s speech was starting to slur. *Defs' SOF* ¶ 40. Rogers also reported that K.M. had two black eyes, appeared thin, and would not answer questions. *Id.* ¶ 41.

White likewise noted that K.M. appeared sick with a runny nose and bags under her eyes. *Id.* ¶ 42.  White also observed that K.M. had another single bruise on her forehead area and a scratch on her neck. The bruise was in a different location than that which she observed a week earlier, on December 17. According to White, it was about the size of a quarter, not raised, and there was no broken skin at or around the bruise. *Id.* ¶ 43. White questioned Amber Clark about the bruise, and Clark informed White that K.M. was slamming her head on the ground when she was upset. Amber Clark also told White that K.M. was awkward on her feet and appeared to fall down a lot. *Id.* With respect to the scratch, Amber Clark said that K.M. was scratched by the family's puppy when K.M. tried to pick it up. *Id.* Moore acknowledges that K.M. would hit her head on the floor but says she never suffered bruising or other injury. *Richardson (aka Moore) Aff.* ¶ 13.

### 2.  White's Return From Vacation

Following this third visit on December 24, White took her Christmas vacation starting on December 25, 2008, and through the next week. She returned to the office on

Monday, January 5, 2009. *Defs.' SOF* ¶ 47. That morning, White faxed a referral to Erin Yinger at A New Hope Social Services, P.L.L.C., requesting that S.M. and K.M. receive an evaluation. *Id.* ¶ 48. Yinger was not in the office, but responded the following morning, on January 6. *Id.* White and Yinger agreed that K.M. would be evaluated for adjustment reaction and, potentially, autism. *Id.* Moore was apparently baffled by White's decision to refer K.M. for an assessment as K.M. had been recently assessed as part of the Head Start Program at both 24 and 27 months, and she had tested within the normal range. *Richardson (aka Moore) Aff.* ¶ 13.

In addition to speaking with Yinger about the assessment, White also called Amber Clark to arrange a visitation for Moore with the children. Clark told Moore that K.M. had fallen down a couple of stairs but was uninjured. White instructed Clark to install gates for the stairs, which the Clarks were required to have. Neither White nor any other IDHW worker confirmed the gates had been installed. *Defs. SOF* ¶ 49.

### 3.  Transfer of Case to Duncan

On that same day, the case was transferred from White to Defendant Duncan, who had no knowledge of, or interaction with, Moore or her children prior to the case transfer. *Id.* ¶ 50. Two days later, Duncan met with White to discuss the case. White told Duncan that Moore had expressed concerns regarding the treatment of K.M. at the Clark home. White told Duncan that she had questioned the foster mom regarding bruising and received what she characterized as credible explanations. White also told Duncan that she had become concerned about K.M.'s development and had therefore referred K.M. to the

MEMORANDUM DECISION AND ORDER - 6

Infant Toddler Program for an evaluation, even though K.M. had recently been treated at Lakeside Pediatrics and no developmental issues were noted. *Id.* ¶ 52.

Later that day, Duncan also spoke with Moore by telephone. Moore told Duncan that she had concerns regarding her children's treatment at the Clark home. Moore was concerned about the change in behavior of K.M. and the bruises she had seen on K.M. Duncan explained that Stacy White had informed her of the situation and she would be open to moving the children if it was appropriate. *Id.* ¶ 53.

### 4. K.M.'s Death

Duncan did not have the opportunity to move the children because that evening, on January 7, 2009, K.M. sustained the injuries that caused her death. The Clarks said she fell down the stairs. The Spokane County Medical Examiner's office found "The claimed explanation for the child's injuries is a fall down a short series of stairs inside a private residence. This story is not consistent with the identified fatal damage to the brain and its coverings, and multiple scalp impact sites (front and back; left and right sides of the head). This death was un-natural. No accidental event that reasonably explains the injuries is identified. The death is thus classified, for death certification purposes, as homicide." *Richardson (aka Moore) Aff.*, Ex. D. The other Moore children were asleep when the event occurred.

Prior complaints had been lodged against the Clarks' for their treatment of other foster children, including complaints that Jeremy Clark was giving foster children "snow baths," described as "a bath in cold water with snow in it to calm down." *Krazier Aff.* ¶ 4,

MEMORANDUM DECISION AND ORDER - 7

p. 9, Dkt. 106-2.  Another foster child also reportedly fell down the stairs at the Clarks'

home in the months preceding the Moore children's placement with the Clarks. *Id.*

However, White has denied knowledge of these prior issues involving the Clarks, *White*

*Aff.* ¶ 39, Dkt. 96-3, and Plaintiffs have not submitted any evidence that White had

learned about these issues before placing K.M. with the Clarks.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any material fact – a fact

"that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party,

and the Court must not make credibility findings. *Id.* at 255.  Direct testimony of the non-

movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

    The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

    This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

## ANALYSIS

### 1.  Substantive Due Process

 "The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." *Tamas v. Dep't of Soc. & Health Servs*., 630 F.3d 833, 842 (9th Cir. 2010). . "'Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care. . . .'"

MEMORANDUM DECISION AND ORDER - 9

*Id.* (quoting *Lipscomb v. Simmons,* 962 F.2d 1374, 1379 (9th Cir.1992) (citations omitted)). This means that K.M. held a protected liberty interest in being shielded from harm inflicted by a foster parent and enjoyed a special relationship with the state once she was placed in foster care.

To violate due process, state officials must act with such deliberate indifference to the liberty interest that their actions "shock the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citation omitted). Conduct that "shocks the conscience" is deliberate indifference to a known danger, or a danger so obvious as to imply knowledge. *Tamas*, 630 F.3d at 844.

Here, Moore noticed three different bruises or "goose eggs" on K.M.'s face and a scratch on K.M.'s neck during three different visits in three weeks.[2] Moore reported her concerns about the bruising to White on two different occasions. White admits to noticing bruises during the last two visits, as well as the scratch on K.M.'s neck. K.M.'s affect and behavior had deteriorated to a point over the three weeks that White agreed that K.M. should be referred for an assessment even though K.M.'s development had tested as normal only a month or two earlier. K.M.'s brother also had reported the Clarks were spanking K.M., and Moore repeatedly insisted that something was not "right" with K.M. and asked that her children be removed from the Clarks' home. Two days before K.M.'s

---

[2] Because the Court must draw all inferences in favor of Plaintiffs, the Court must assume that K.M.'s appearance and behavior was as both Moore and Rogers described it.

**MEMORANDUM DECISION AND ORDER - 10**

fatal injuries, Amber Clark reported to White that K.M. had fallen down the stairs, and she admitted that she had not erected baby gates as required by IDHW rules.

Plaintiffs have also presented some evidence that prior complaints had been lodged against the Clarks' for their treatment of other foster children, including complaints that Jeremy Clark was giving foster children "snow baths," described as "a bath in cold water with snow in it to calm down." *Krazier Aff.* ¶ 4, p. 9, Dkt. 106-2.  Another foster child also reportedly fell down the stairs at the Clarks' home in the months preceding the Moore children's placement with the Clarks. *Id.* However, White has denied knowledge of these prior issues involving the Clarks. *White Aff.* ¶ 39, Dkt. 96-3.

Given these facts, the Court cannot find that White was deliberately indifferent to a known or obvious danger of abuse. Deliberate indifference is not the same thing as negligence or carelessness. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). On the contrary, the Ninth Circuit has made clear that a state official acts with deliberate indifference in the foster care context only (1) when an objectively substantial risk of harm exists *and* (2) when the state official was "subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official *actually drew that inference* or that a reasonable official *would have been compelled to draw that inference*" because the risk of harm is obvious. *Tamas*, 630 F.3d at 845. White, then, cannot be liable to Plaintiffs unless she both *knew* of and *disregarded* an excessive risk of abuse to K.M. *Id.*

Although K.M. presented with single bruises on two, and possibly three, separate

occasions, and seemed tired and listless, the Clarks' explanations for K.M.'s condition were not so outlandish as to make them patently unbelievable. Two-year olds often fall and suffer bruises, and two-year olds often catch a cold or the flu in the winter months. K.M. had also been removed from the only home she had ever known. Each of these factors could have accounted for K.M.'s condition at the December 24 visit. Therefore, some bruising and general lethargy and sleepiness in a two-year old would not have compelled a reasonable case worker to know or suspect that the Clarks were abusing K.M.  Nor is there any evidence that White knew of the prior complaints against the Clarks, which may have alerted White to a serious risk to K.M. Accordingly, it cannot be said that White acted with deliberate indifference. *Tamas*, 630 F.3d at 844; *see also James ex rel. James v. Friend*, 458 F.3d 726, 730-31 (8th Cir. 2006) (finding department of family service defendants may have been negligent by being "insufficiently skeptical" about foster parents' explanations for foster child's injuries but their willingness to accept those explanations did not rise to the level of deliberate indifference).

   Likewise, the Court cannot conclude that a jury could find that Duncan demonstrated a deliberate indifference to a known or obvious danger. White transferred the case file to Duncan a mere two days before K.M. sustained the injuries leading to her death, and Duncan only spoke to Moore the afternoon before K.M. sustained the fatal injuries. This did not leave Duncan reasonable and sufficient time to assess the situation and take meaningful action. Therefore, Duncan is entitled to dismissal of the substantive due process claim against her.

MEMORANDUM DECISION AND ORDER - 12

It should also be noted that even if the Estate and Samantha Moore, as the mother of K.M., could survive summary judgment on the substantive due process claim, neither Rogers, the grandmother, nor S.M. and A.M, K.M. siblings, can bring a substantive due process claim. The substantive due process right to the companionship of one's child has not been extended to one's grandchild. *Miller v. California*, 355 F.3d 1172, 1175 (9th Cir. 2004). Nor has the constitutional right been extended to one's sibling. *Ward v. City of San Jose*, 967 F.2d 280, 283-84 (9th Cir.1991). Therefore, Plaintiffs' complaint fails to state a federal cause of action with respect to K.M.'s grandmother, Karin Rogers, and her siblings, S.M. and A.M.

### 2.  Conspiracy

Plaintiffs also assert a claim for conspiracy under 42 U.S.C. § 1983 and/or § 1985, alleging that Defendants conspired to deprive them of their federally protected rights. To prove conspiracy under § 1983, Plaintiffs must show an agreement or meeting of minds to violate their constitutional rights. *Woodrum v. Woodward Cnty.*, 866 F.2d 1121, 1126 (9th Cir. 1989). Plaintiffs cannot prove this claim. First, Plaintiffs must prove that Defendants violated their constitutional rights, which they have not done. *Menefield v. Helsel*, 78 F.3d 594 (9th Cir. 1996) ("A conspiracy allegation does not give rise to § 1983 liability unless there is an actual deprivation of civil rights."). Second, Plaintiffs have submitted no evidence suggesting that White conspired with Duncan with the purpose of depriving Plaintiffs of their constitutional rights.

There is also no evidence to support a conspiracy claim under 42 U.S.C. § 1985. To

MEMORANDUM DECISION AND ORDER - 13

state a violation of 42 U.S.C. § 1985(3), the plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). Plaintiffs must also show some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions. *Id.* at 835. Plaintiffs have not provided any facts to support their allegations of racial discrimination and, therefore, cannot carry their burden on this claim.

### 3.  State Law Claims

#### A.  *Karin Rogers*

Karin Rogers did not file a timely notice of tort claim as required by the Idaho Tort Claims Act ("ITCA"); therefore she cannot pursue her state law claims. *Greenwade v. Idaho State Tax Comm'n*, 808 P.2d 420, 422 (Ct. App. 1991). "[T]he filing of a notice of claim as required by the [ITCA] is a mandatory condition precedent to bringing suit, the failure of which is fatal to a claim, no matter how legitimate." *Banks v. Univ. of Idaho*, 798 P.2d 452, 453 (Idaho 1990) (internal quotation marks omitted). The proper presentation of a claim against the state or a state employee is through filing the claim with the secretary of state. *Id.* at § 6-905.

A claimant must not only file a notice of tort claim, but the filing must be timely. "No claim or action shall be allowed against a governmental entity or its employee unless the

MEMORANDUM DECISION AND ORDER - 14

claim has been presented and filed within the time limits prescribed by [the ITCA],"

which is "within one hundred eighty (180) days from the date the claim arose or

reasonably should have been discovered, whichever is later." *Id*. at § 6-905. *Id*. at § 6-

908. [F]ailure to file a claim within the 180–day time limit acts as a bar to any further

action." *Mallory v. City of Montpelier*, 885 P.2d 1162, 1164 (Idaho Ct. App. 1994).

K.M. was injured on January 7, 2009, and died on January 16, 2009. To make a

timely filing, Rogers would have had to file her notice of tort claim no later than July 15,

2009. But Rogers has never filed a notice of her claims with the Idaho Secretary of State.

Therefore, Rogers is barred from pursuing her state law claims.

### B.   *Negligent Infliction of Emotional Distress*

The tort of negligence includes a claim for negligent infliction of emotional distress

which requires the same elements as a common law negligence action. *Nation v. State*

*Dep't of Correction*, 158 P.3d 953, 965–66 (Idaho 2007). The elements for this claim are:

(1) a duty recognized by law requiring the defendant to conform to a certain standard of

conduct; (2) a breach of that duty; (3) a causal connection between the defendant's

conduct and the plaintiff's injury; and (4) actual loss or damage. *Johnson v. McPhee*, 210

P.3d 563, 574 (Idaho Ct. App. 2009) (citing *Brooks v. Logan*, 903 P.2d 73, 78 (Idaho

1995)).

Under Idaho law, "no cause of action for negligent infliction of emotional distress will

arise where there is no physical injury to the plaintiff." *Czaplicki v. Gooding Joint Sch.*

*Dist. No. 231*, 775 P.2d 640, 646 (Idaho 1989). Idaho courts have adopted the "physical

injury" requirement "to provide some guarantee of the genuineness of the claim in the face of the danger that claims of mental harm will be falsified or imagined." *Id.* However, physical manifestations of emotional injury, such as headaches, suicidal ideation, sleep disorders, fatigue, stomach pain and loss of appetite, are sufficient to satisfy the physical injury requirement.  *Id.*

Here, Plaintiffs contend the evidence shows that Defendants' conduct resulted in physical manifestations of severe emotional distress in Samantha Moore including PTSD (Post-Traumatic Stress Disorder), sobbing, shaking, numbness, hysteria, difficulty eating, sleeplessness, nightmares, anxiety, depression, withdrawal from friends and social activities, low self-esteem, obsessive rumination of what happened to her daughter, nervous system hyperarousal (disordered sleep and irritability), nausea,  hypervigilance, and insecurity. As to S.M., he has been diagnosed with PTSD, Attention Deficit Hyperactivity Disorder (ADHD) and depressive disorder. He now exhibits signs of serious, angry outbursts. Under Idaho law, these conditions, if proven, would satisfy the physical injury requirement with respect to Moore and S.M. (but not A.M, who was an infant at the time her sister died). *Id.*

However, Defendants argue, based not upon a decision of the Idaho Supreme Court, but upon the Ninth Circuit's decision in *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398 (9th Cir. 1994), that Idaho imposes an additional requirement that a plaintiff pursuing a negligent infliction of emotional distress claim must satisfy the so-called "bystander proximity rule."  The Court is unpersuaded.

MEMORANDUM DECISION AND ORDER - 16

In *Chan,* the Ninth Circuit was considering how a claim of negligent infliction of emotional distress should be handled under maritime law. In resolving that case, the court surveyed the common law requirements for such a claim, and made the following observation:

> We next must decide the threshold standard that must be met by plaintiffs bringing claims for negligent infliction of emotional distress. As instructed by the Court in *Gottshall* and *Buell*, we look to state common law for guidance. At present, state courts have proposed or adopted three main theories limiting the recovery of damages for emotional distress. Under the most restrictive theory, the "physical injury or impact" rule, the plaintiff may recover emotional distress damages only if he or she suffers an accompanying physical injury or contact. Under the next most restrictive theory, the "zone of danger" doctrine, the plaintiff may recover even though there is no physical contact, so long as the plaintiff (1) witnesses peril or harm to another and (2) is also threatened with physical harm as a consequence of the defendant's negligence. The zone of danger test currently is followed in 14 jurisdictions.
>
> The third theory, adopted by nearly half the states, including California and Washington, is the "bystander proximity" rule. The bystander proximity rule permits recovery, even if one is not in the zone of danger, provided the complainant: (1) is physically near the scene of the accident; (2) personally observes the accident; and (3) is closely related to the victim. Dillon v. Legg,

39 F.3d at 1409 (citations omitted).

From this language, and without the benefit of any Idaho case so holding, defendants argue that Idaho would follow the bystander proximity rule. However, in so arguing, defendants ignore the plain language in *Czaplicki* charting a different course – adopting the physical injury requirement but allowing it to be satisfied by physical manifestations of emotional injury.

Defendants do cite *Czaplicki* as supporting their claim that the Idaho Supreme Court implicitly adopted the bystander proximity rule. However, the defendants' reliance on

*Czaplicki* is misplaced.  That decision expressly adopted a physical injury requirement and suggests no other limitation on the availability of a negligent infliction of emotional injury claim.  The most that can be said is that one of the plaintiffs – the mother of the deceased child – was physically present when the child died and could, therefore, satisfy the bystander-proximity rule.  However, there is not a single word in *Czaplicki* suggesting that the mother's presence was critical to the court's decision.  Moreover, as plaintiffs point out, the husband in *Czaplicki* was also deemed to have a valid emotional distress claim even though there were no facts cited in the case suggesting the husband was present when the child was injured. *Czaplicki*, 775 P.2d at 646. In short, the Court is wholly unpersuaded that Idaho has implicitly adopted the "bystander proximity rule."

Defendants also rely on *Zaleha v. Rosholt, Robertson & Tucker, Chtd*., 953 P.2d 1363, 1365 (Idaho 1998), for the proposition that Idaho does not allow recovery for emotional distress for conduct directed at another person, arguing that Moore and S.M. seek a recovery for emotional distress based upon conduct directed at K.M. In *Zaleha,* the Idaho Supreme Court did not allow the spouse to recover against the defendants for the spouse's emotional distress arising out of defendants' terminating her husband's employment. However, the court's focus in *Zaleha,* was on a lack of causation because any emotional injury the wife suffered because of her husband's termination from employment "was indirect injury based on her emotional reaction to the conduct of the defendants toward [her husband]." *Id.*

Moore and S.M.'s claims are far different from the claims in *Zaleha.*  Generally

speaking, it would not be foreseeable that a wife would suffer severe emotional distress because her husband lost his job. By contrast, it is foreseeable that a wife and sibling would suffer serious emotional harm from the violent death of a child. *See, e.g., Dziokonski v. Babineau,* 380 N.E.2d 1295 (Mass. 1978) ("[R]easonable foreseeability is a proper starting point in determining whether an actor is to be liable for the consequences of his negligence."). Indeed, the Idaho Supreme Court, by allowing the parents of a six-year-old child whose death was allegedly caused by the defendant's negligence to proceed with their negligent infliction of emotional distress claim, has implicitly acknowledged this reality. *Czaplicki,* 775 P.2d at 646; *see also Ferriter v. Daniel O'Connell's Sons, Inc.*, 413 N.E. 2d 690 (Mass. 1980) (finding employee's wife and children who observed the employee injured through employer's negligence in the hospital following the accident stated claim for negligent infliction of emotional distress). Like the Idaho Supreme Court in *Czaplicki*, this Court finds that Moore and S.M.'s claims for negligent infliction of emotional distress survive summary judgment.

## C. *Intentional Infliction of Emotional Distress*

To establish a claim for intentional infliction of emotional distress: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *Edmondson v. Shearer Lumber Prod.,* 75 P.3d 733, 740 (Idaho 2003). Plaintiffs claim that Defendants intentionally or recklessly ignored signs of abuse, which resulted in the Clarks causing the tragic death of K.M.,

causing severe emotional distress.

To prevail on a claim of intentional infliction of emotional distress, Plaintiffs must prove "conduct that is very extreme." The conduct must be not merely unjustifiable; it must rise to the level of 'atrocious' and 'beyond all possible bounds of decency,' such that it would cause an average member of the community to believe that it was outrageous." *Johnson v. McPhee*, 464, 210 P.3d 563, 572 (Idaho Ct. App. 2009) (internal citation omitted). Here, as discussed above, Plaintiffs cannot show that Defendants acted intentionally or recklessly in ignoring the any signs of abuse, and therefore they cannot meet their burden of proving "extreme and outrageous" conduct.

### D. Negligent Training

In their Amended Complaint Plaintiffs allege that Defendants acted negligently and with reckless indifference with respect to their duty to train the Clarks. *Am. Compl.*, p. 5, Dkt. 54. Defendants argue that Plaintiffs cannot prevail on this claim because they are unable to provide any evidence that White or Duncan had a legal duty to train the Clarks. Plaintiffs provide no response to this argument and the Court cannot find anything in the record from which a reasonable juror could find that White or Duncan had the specific responsibility within the IDHW to train the Clarks. The Court will therefore dismiss this claim.

### E. Wrongful Death

"Under I.C. § 5–311, when the negligence of another causes a person's death, the decedent's heirs or personal representative may maintain an action for damages against

MEMORANDUM DECISION AND ORDER - 20

the wrongdoer." *Turpen v. Granieri*, 985 P.2d 669, 672 (Idaho 1999).  Rogers, S.M., and A.M. cannot recover for alleged wrongful death of K.M. because they do not meet the definition of a statutory heir as defined in the statute providing for intestate succession; only Moore, as the surviving parent of K.M., would stand to inherit any property belonging to K.M. according to the laws of intestate succession. I.C. § 5-311(1)-(2); *Nebeker v. Piper Aircraft Corp.*, 747 P.2d 18, 20 (Idaho 1987). Therefore, only Moore is a proper party to the wrongful death action. *Id.*

"[A]n heir may only recover for wrongful death if the decedent would have been able to recover. Thus, the heir must prove that the wrongful act or negligence of the defendant caused the injury and resulting death." *Turpen*, 985 P.2d at 672 (internal citation omitted).

The Idaho Supreme Court has recognized that employees of the Idaho Department of Health and Welfare owe a duty to competently investigate reports of child abuse. *Rees v. State, Dep't of Health & Welfare*, 137 P.3d 397 (Idaho 2006). In *Rees*, the Court concluded that the Idaho Child Protection Act "creates a special relationship between allegedly abused children and the Department [of Health and Welfare]" even if when the allegedly abused child is never placed in the custody or care of the state. *Id.* at 405. It therefore seems that the Idaho Supreme Court would recognize a cause of action for the negligent supervision of care provided by foster parents to a child *who is placed in the custody of the state* and who is involuntarily placed in a foster home.

In this case, Moore has submitted sufficient evidence to create an issue of fact

regarding White's alleged negligence. As already noted, it is undisputed that K.M. presented with two different "goose egg" bruises on her forehead and a scratch on her neck within a two-week period. In addition, K.M. had black circles around her eyes, she was slurring her words, and her affect and behavior had deteriorated to a point over the three weeks that White agreed that K.M. should be referred for an assessment even though K.M.'s development had tested as normal only a month or two earlier. K.M.'s brother also told his mother that the Clarks were spanking K.M. Moore believed that the Clarks were abusing K.M., and she repeatedly begged White to remove the children from the Clarks' home. Two days before K.M.'s fatal injuries, Amber Clark reported to White that K.M. had fallen down the stairs, and she admitted that she had not erected baby gates as required by IDHW rules.

White did investigate what had caused the bruises and asked Amber Clark why K.M. appeared so listless. White received what she believed to be satisfactory answers. Given that White did not sit by and do nothing, it might be concluded that she exercised ordinary care. Significantly, however, prior complaints had been lodged against the Clarks because of their treatment of other foster children, including the serious allegation that Jeremy Clark was giving foster children "snow baths," described as "a bath in cold water with snow in it to calm down." *Krazier Aff.* ¶ 4, p. 9, Dkt. 106-2.  Another foster child also reportedly fell down the stairs at the Clarks' home in the months preceding the Moore children's placement with the Clarks. *Id.*

A reasonable juror could therefore find that White acted negligently in her willingness

to accept Clarks' explanations for K.M.'s injuries and her failure to investigate the

Clarks' background in the face of K.M.'s injuries and rapidly deteriorating condition.

White had access to IDHW documents, had immediate access to fellow staff members,

and had adequate time to exercise her professional judgement to act affirmatively on

behalf of the Moore children. *Krazier Aff.* ¶ 8. Perhaps if White had learned earlier that

Jeremy Clark was placing foster children in freezing water as a form of punishment and

that the Clarks had previously failed to erect the required baby gates, she may have been

more skeptical about Amber Clark's explanations for K.M.'s injuries and more proactive

in removing K.M. from the Clarks' care. It therefore could be said that White was

negligent in failing to ensure K.M.'s safety while in the custody of the state.

Questions of fact also exist with respect to causation. Moore submits the report of the

medical examiner, who concluded that K.M.'s injuries were not consistent with a fall

down the stairs and classified the death as a homicide. *Richardson (aka Moore) Aff.*, Ex.

D. Although the ME's report is hearsay, the ME could testify about the cause of K.M.'s

death, assuming of course that Moore has properly disclosed the ME as a potential

witness at trial. Based on the ME's report, the jury could conclude that the Clarks killed

K.M. And even if a fall down the stairs did cause K.M.'s death as the Clarks profess, it

could be said that White was negligent in not ensuring the safety of the Clarks' home

given that both another foster child *and* K.M. had fallen down the stairs at the Clarks'

home on earlier occasions.

The Court, however, will dismiss the negligence claim against Duncan. Duncan

MEMORANDUM DECISION AND ORDER - 23

simply did not have sufficient time or information to have removed K.M. from the Clarks' home before K.M. sustained the injuries that led to her death. Duncan only had White's description of and explanation for K.M.'s injuries – she did not see them herself. Therefore, she had no reason to believe that she only had hours to remove K.M. from the Clarks' home before K.M. sustained fatal injuries. For these reasons, Duncan should not be held liable as a matter of law for K.M.'s death.

## ORDER

**IT IS ORDERED that** Defendants Stacy White and Jennifer Duncan's Motion for Summary Judgment (Dkt. 96) is GRANTED in part and DENIED in part.



DATED: November 18, 2015

B. Lynn Winmill
Chief Judge
United States District Court